Filed 5/20/22  P. v. Shivers CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>DAVID CATRELL SHIVERS,<br><br>        Defendant and Appellant. | A161307<br><br>(Alameda County Super.<br>Ct. No. 18CR002212) |

In 2017, defendant David Shivers fatally shot Rodney Lee after an argument that began when Shivers asked Lee to move his car.  A jury found Shivers guilty of second-degree murder and being a felon in possession of a firearm.  Shivers appeals, making four arguments:  (1) the trial court erred in failing to define the terms "initial aggressor" and "starts a fight" in one jury instruction; (2) the trial court erred in allowing a readback of certain testimony requested by the jury in the absence of defense counsel; (3) the jury committed misconduct by learning of the issuance of a shelter-in-place order on March 16, 2020, the final day of their deliberations, and the trial court erred in its response to the jury's question about how that order would affect deliberations; and (4) the police violated due process by allowing a server allegedly holding a recording of an interview with a key prosecution witness to be destroyed.  We reject the arguments, and we affirm.

1

## BACKGROUND

On February 1, 2018, the Alameda County District Attorney filed a complaint charging Shivers with the December 12, 2017 murder of Rodney Lee (Pen. Code, § 187, subd. (a))[1] (count 1) and possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 2). With respect to count 1, the complaint alleged that Shivers had personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). The complaint further alleged three prior convictions.

Trial took place in March of 2020, where Carrie Mason testified as follows:

On December 12, 2017, Mason drove with her daughter in the backseat and her friend Jayla Murray to the store on Apgar and West Street in Oakland. Mason parked in front of the store and started smoking marijuana. She then went inside to buy cigarettes. Meanwhile, Jayla got out of the car and began talking to Shivers on the corner. A little later, Shivers asked Mason to move her car, and she did.

Lee texted Mason and asked where she was, and she told him, knowing that he would come to meet her. Lee arrived a few minutes later and double-parked his red Honda on Apgar street next to Mason's car. Lee got out of his car, hugged Mason, and the two began talking.

Shivers then approached Lee and said, "Move your car." Lee responded, "Why you sweating me?," "kinda laughing when he said it," and Shivers said, "You're making the block hot," which Mason understood to mean drawing negative attention. Shivers then walked over to his car, and Lee and Mason resumed talking. Shivers again approached Lee, and in a

---

[1] All undesignated statutory references are to the Penal Code.

2

"more hostile" and "[a]ggressive" tone, said "I told you to move your car." Lee turned to Shivers and said "I ain't never been scared to fight." Shivers then hit Lee across his cheek. Lee turned his body toward Shivers, Mason heard a "boom," and Lee fell over.

David Ammons testified that Shivers "asked [Lee] politely can he move his car. There's school or traffic, people are trying to get to the school and pick up their kids and stuff." Shivers "asked [Lee] a couple times to move his car, and dude was like, 'man.' I believe, like, 'OG, why you sweating me, man,' or something to that nature." Ammons also heard Lee say something to the effect of "What do you think, I'm supposed to be scared or something?" and "Man, I don't give a fuck, fuck all that." Ammons then saw Shivers "hit [Lee] and then [Lee] rushed on him. He stepped back, and that's when I heard the gunshot." "Rushed on" meant "approached him, like, in a threatening manner." Lee then spit up blood and fell to the ground.

Shivers testified in his own defense that he asked Lee "Hey, brother, can you move your car right there" and Lee responded "Why you sweating me. I don't have to move any car for nobody. Who you telling me to move my car? I don't back down for nobody." When Shivers asked Lee to move his car a second time, he responded "I don't back down for nobody." Lee said something like "he keep it on him," which Shivers took to mean that Lee had a gun. Lee moved his arms and Shivers thought he was "trying to reach for something," so he "shoved [Lee] in his face." Lee then "rushed me, swinging his arms," and Shivers was "backpedaling." "As I was backpedaling, it looked like he reached in his waistband. I thought I saw a weapon." Shivers "thought I saw a gun in [Lee's] hand." Shivers then drew his own gun and fired. Shivers did not have time to aim. After he fired the gun, he ran away.

Lee died from a single gunshot wound to his torso.

On the morning of March 16, the trial court instructed the jury and they began deliberations. They reached a verdict that afternoon, finding Shivers guilty of second-degree murder and possession of a firearm by a felon, and the firearm enhancement true.

Shivers moved for a new trial on the grounds that the jury had committed misconduct in learning of the shelter-in-place order issued during deliberations, that the trial court erred in its response to a jury question regarding that order, and that the trial court erred in instructing the jury with CALCRIM No. 3471. After a hearing, the trial court denied the motion.

On October 30, the trial court sentenced Shivers to 15 years to life on count 1, plus 10 years for the section 12022.5, subdivision (a) enhancement. The trial court imposed a sentence of 8 months on count 2 and stayed that sentence pursuant to section 654.

Shivers filed a notice of appeal.

## DISCUSSION

**The Trial Court Was Not Required To Clarify "Initial Aggressor" or "Starts a Fight" in CALCRIM No. 3471**

The jury was instructed with CALCRIM No. 3471, titled by the authors "Right to Self-Defense: Mutual Combat or Initial Aggressor." The instruction provides as follows[2]:

"A person who . . . starts a fight has a right to self-defense only if:

"1. He actually and in good faith tried to stop fighting;

"AND

---

[2] Because we conclude there is no merit to Shivers's objection to this instruction, we need not reach the parties' arguments about whether the argument was waived because defense counsel did not request that the trial court clarify the instruction.

4

"2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting.

"If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

"However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting."

Shivers argues that the phrases "Initial aggressor" in the title of CALCRIM No. 3471 and "starts a fight" in the text of that instruction are ambiguous, and thus the trial court had a sua sponte duty to clarify them.

**Applicable Law**

"The rules governing a trial court's obligation to give jury instructions without request by either party are well established. 'Even in the absence of a request, a trial court must instruct on general principles of law that are . . . necessary to the jury's understanding of the case.' [Citations.] That obligation comes into play when a statutory term 'does not have a plain, unambiguous meaning,' has a 'particular and restricted meaning' [citation], or has a technical meaning peculiar to the law or an area of law [citation]." (*People v. Roberge* (2003) 29 Cal.4th 979, 988.) "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning." (*People v. Estrada* (1995) 11 Cal.4th 568, 574; accord, *People v. Roberge*, *supra*, 29 Cal.4th at p. 988.)

5

" 'If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' (*People v. Smithey* (1999) 20 Cal.4th 936, 963; *Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4.) ' " ' " [T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. " ' " ' (*Smithey*, at p. 963, quoting *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury. (See *People v. Garceau* (1993) 6 Cal.4th 140, 189 [any possibility of confusion about conspiracy instruction was diminished by the parties' closing arguments], disapproved on another ground in *People v. Yeoman* [(2003)] 31 Cal.4th [93,] 117–118; *People v. McPeters* (1992) 2 Cal.4th 1148, 1191 [correct view of the law regarding mitigating factors in penalty phase trial was reinforced by the parties' closing arguments].)" (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

**Analysis**

Turning first to Shivers's argument regarding "Initial Aggressor," that term was not read to the jury as part of the court's oral instructions, and at the hearing on Shivers's motion for a new trial, the trial court rejected the argument, explaining as follows:

"The second one I can deal with more succinctly, and that is the argument by the defense is that 'initial aggressor' should have been defined. This argument is in opposition because the words, quote, initial aggressor, end quote, are not in the instruction, and the jurors were never provided with the instruction titles. The written copy of the instructions sent into deliberations omitted the titles of each instruction while keeping the CALCRIM number. Logically, the Court should not define words not given in

any instruction."

Shivers does not dispute that the jury's copy of the instructions did not include the title.[3]  Because neither the oral nor written version of the jury instruction contained the term "Initial Aggressor," there was no error in failing to define it.

We turn next to Shivers's argument that "starts a fight" was ambiguous, and thus required clarification from the trial court, an argument that proceeds as follows:  Section 197, subdivision (3), provides that if the defendant invoking self-defense "was the assailant or engaged in mutual combat," he or she "must really and in good faith have endeavored to decline any further struggle before the homicide was committed."  Black's Law Dictionary defines "assailant" as "a person who assaults another person." CALCRIM No. 915, the instruction for the crime of assault (§ 240), includes that the defendant did an act that would "result in the application of force to a person," but Webster's Dictionary defines assault as "to attack violently with blows or words."  Thus, there is purported ambiguity as to whether "starts a fight" can include "attack[ing] violently with . . . words" only.[4] Shivers further argues that under *People v. Minifie* (1996) 13 Cal.4th 1055, there is a third—and correct—meaning of "starts a fight"—where the victim verbally threatens violence, and then does an "overt act" causing the defendant to fear imminent danger of death or great bodily injury, the victim

---

[3] Shivers merely asserts that "the only copy of the jury instructions which is in the record" contains titles, and observes that the prosecutor used the phrase "initial aggressor" in closing argument.

[4] How this purported ambiguity prejudiced Shivers is unclear, since he did not dispute that he physically shoved Lee.

is deemed to have "started the fight" and self-defense will be available to the defendant. (See *id.* at p. 1069.)

We reject the argument. The jury did not have section 197, Black's Law Dictionary, or CALCRIM No. 915 before them, and we do not assume that they reached an ambiguous understanding of the ordinary phrase "starts a fight" by resorting to these unavailable resources. (See *People v. Adcox* (1988) 47 Cal.3d 207, 253 ["As a general matter it must be presumed that the jurors observed and applied the instructions given them"].) And the phrase "starts a fight" is ordinary language that the jury was well equipped to understand. (See *People v. Bland* (2002) 28 Cal.4th 313, 334 ["A court has no sua sponte duty to define terms that are commonly understood by those familiar with the English language"].)

In any event, to the extent there was any ambiguity, we find no reasonable probability that the jury misapplied or misunderstood the instruction. The jury was given what Shivers asserts is the correct explanation of the law by the closing argument of defense counsel:

"You wait, you may not have the ability to respond. The person using self-defense must be hit. No, that's not what the law says. You don't have to be hit. You can act based on a reasonable fear of imminent harm, of great bodily injury, or death. And if you're reacting based on that fear, you don't have to wait to be hit. The law of self-defense does not require that the person has to use the least amount of force possible. The law of self-defense does not require that the person has to use the same type of force as the other person. And this is important to keep in mind, because [the prosecutor] repeated this common misnomer that you don't bring a knife to a gunfight. You don't bring a gun to a fistfight. It's just things you might hear in movies. These are things that you might hear in novels or social media. That's not

8

what the law is. The law is not that you cannot respond; that you must respond to the same amount of force as is used against you. So if somebody is responding—if somebody is acting with their arms, and you believe that you are in danger, you don't have to wait until you're hit; and you don't have to respond only with a punch, so long as you are in fear of imminent great bodily injury or death."

Later on, defense counsel explained that the question of whether Shivers started a fight was a factual one for the jury to resolve:

"Now, the District Attorney told you about this instruction, 3471. And that instruction deals with a situation when a person has started a fight. And she's argued to you now that if you start a fight, then you have the right to self-defense. But you have to decide that there was a fight. [¶] Now, Mr. Shivers admitted that he did shove Mr. Lee, but he also told you that he wasn't trying to fight the guy. His testimony was: I didn't want [to] fight in front of my family."

In short, we do not agree that there was anything ambiguous about the jury instructions use of the phrase "starts a fight," and even assuming ambiguity, we find no reasonable probability that the jury misapplied or misunderstood the instruction as given.

**The Trial Court Did Not Err in Excluding Defense Counsel from the Readback of the Testimony of David Ammons**

Shivers next argues that the trial court erred in permitting the jury's requested readback of the testimony of Ammons to go forward without the presence of defense counsel.

**Additional Background**

At noon on the first and only day of deliberations, the jury gave a written request to the deputy to "read back entire testimony of David

9

Ammons." At 12:10 p.m., the trial court emailed counsel: "The deputy just handed me a note that reads 'Clerk read back entire testimony of David Ammons'. [¶] The jury has gone to lunch, will be back at 1:00. Readback can occur at 1:30 in courtroom by the court reporter." There were two more emails regarding the shelter-in-place order that did not mention the readback. Then at 1:48 p.m., the trial court emailed counsel again:

"The court reporter is about to begin readback of the Ammons testimony to the jury. I am handling this as though she would be going to the jury room to do the readback. There is no good way to do readback with the parties present given that I have changed the courtroom into the jury deliberation room." The prosecutor responded to the email at 1:52 p.m. indicating that she waived her appearance for the readback.

According to the minutes, at 1:30 p.m., "Court reporter Julie Bozaich prepares read back from 1st written request," at 1:55 p.m. "Court reporter begins read back in the jury deliberation room," and at 2:00 p.m., "Read back concludes."

At 2:14 p.m., defense counsel emailed back "I understand the court's position regarding read-back of Ammons' testimony but can I ask the record to reflect that I wanted to be present?"

After the verdict, defense counsel renewed his objection for the record, and the trial court "indicate[d] that I chose that course of action, as I would or could in any event, but especially in these circumstances where it would be next to impossible given that I turned my whole courtroom over to the jury deliberation room in this Covid-19 situation where they needed to be socially distant from one another. And since it was the entirety of one witness' testimony, I thought it could just be done, and that was my order."

10

**Applicable Law**

"The Sixth Amendment right to the assistance of counsel applies at all critical stages of a criminal proceeding in which the substantial rights of a defendant are at stake." (*People v. Crayton* (2002) 28 Cal.4th 346, 362; see *Gardner v. App. Div. of Superior Ct.* (2019) 6 Cal.5th 998, 1004 ["For purposes of determining whether the right to counsel extends to a particular proceeding, we have described a critical stage as 'one "in which the substantial rights of a defendant are at stake" [citation], and "the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial" [citation]' "].)

Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

**Analysis**

Shivers argues that not permitting his counsel to be present for the read back denied him the assistance of counsel at a critical stage of the proceedings. However, as Shivers acknowledges, our Supreme Court has repeatedly held that a readback of testimony is not a critical stage of trial. (See *People v. Lucas* (2014) 60 Cal.4th 153, 300 ["a readback proceeding is not a critical stage of trial"]; *People v. Butler* (2009) 46 Cal.4th 847, 865 [" 'We have repeatedly stated that the rereading of testimony is not a critical stage of the proceedings' "]; *People v. Cox* (2003) 30 Cal.4th 916, 963 [same];

11

*People v. Ayala* (2000) 23 Cal.4th 225, 288 (*Ayala*) ["The rereading of testimony is not a critical stage of the proceedings"].)[5]

In any event, even assuming error, Shivers has failed to demonstrate any prejudice. Ammons's testimony on direct examination occupies 16 pages of the transcript, and his cross-examination a further 27. Shivers's argument regarding prejudice is that because the minutes indicate the readback began at 1:55 p.m. and ended at 2:00 p.m., and thus took only 5 minutes, the court reporter must have read only Ammons's direct examination, and that had defense counsel been present, he could have requested that the cross-examination testimony be read as well—testimony that, according to Shivers, "was critical to the defenses of complete self-defense and imperfect self-defense." We reject the argument.

*Ayala*, *supra*, 23 Cal.4th 225 is instructive. There, defense counsel and the defendant waived their right to be present during the readback of certain testimony requested by the jury. (*Id*. at p. 287.) A note from the foreperson indicated that the jury had asked the court reporter to stop the readback during the cross-examination of a particular witness. (*Id*. at p. 288.) Our Supreme Court rejected defendant's claim of ineffective assistance of counsel:

"We also reject defendant's claim that counsel's decision to waive any right to be present during the rereading constituted ineffective assistance of counsel. Even if such a right were established, defendant could not show

---

[5] Shivers's attempts to distinguish these cases are not persuasive. Shivers argues that *People v. Lucas*, *People v. Cox*, and *People v. Ayala* are inapposite because counsel waived any right to be present for the readback, while the opinion in *People v. Butler* did not indicate whether counsel was present for the readback, but rejected the defendant's argument that he was himself entitled to be present. Nevertheless, the logic of all of these cases was in part that there was no error because a readback is not a "critical stage" of the proceedings.

prejudice. First, ' "It is presumed that official duty has been regularly performed. . . ." (Evid. Code, § 664.) This presumption applies to . . . court reporters . . . .' (*People v. Wader* (1993) 5 Cal.4th 610, 661.) Therefore we assume the reporter properly read the testimony until stopped by the jury. And even if counsel had been present and demanded that the reporter continue to reread the testimony, defendant could not have compelled the trial court to order the jury to continue to listen to the rereading of testimony once it was satisfied it had heard enough. Defendant concedes as much, and he is correct. [Citations.]" (*Ayala, supra*, 23 Cal.4th at p. 289.)

So too here. The jury's note requested the "entire" testimony of Ammons, and we "assume the reporter properly read the testimony until stopped by the jury." (*Ayala, supra*, 23 Cal.4th at p. 289.) And even if defense counsel had been present for the readback, he could not have required the jury to listen to a readback of the cross-examination testimony if it did not wish to.[6] (*Ibid.*)

Shivers's reliance on *People v. Hogan* (1982) 31 Cal.3d 815, 849 (*Hogan*) is unavailing. There, the jury requested certain exhibits during deliberations and, without notifying counsel, the trial court sent the jury a jailhouse tape, which included "inadmissible and highly prejudicial material concerning [defendant']s reluctance to take a lie detector test." (*Id.* at p. 850.) The court

---

[6] Shivers's statutory argument fails for a similar reason—neither defense counsel nor the trial court could require the jury under section 1138 to listen to a readback of testimony that it did not wish to hear. "[T]he mandate of . . . section 1138 is an important protection for a party, it is the right of the jury which is the primary concern of the statute; its provisions do not delegate to the trial judge, the parties, or their attorneys the right to determine the jury's wishes." (*People v. Butler* (1975) 47 Cal.App.3d 273, 283; *People v. Gordon* (1963) 222 Cal.App.2d 687, 689 ["The trial judge does not have to order read any part of the testimony not requested by the jury foreman"].)

held that "[a] jury request for exhibits during deliberation is a critical stage of the prosecution during which the right to counsel applies," that prejudice is presumed; and that if "counsel [had] been properly notified of the jury's requests before the exhibits were sent into the jury room," the inadmissible portion of the tape would never have reached the jury, such that the presumption of prejudice was unrebutted. (*Ibid.*)

*Hogan* is distinguishable in several respects. First, the trial court here did notify counsel of the jury's request, such that counsel had an opportunity to object to the readback and did not do so. Second, to the extent that dictum in *Hogan* suggests that a readback of testimony, as opposed to the transmission of exhibits, is a critical stage of the proceedings, it has been undermined by the various subsequent Supreme Court cases cited. Third, any presumption of prejudice has been rebutted in this case, even under the "harmless beyond a reasonable doubt" standard of *Chapman*—even if counsel had been present, he had no authority to require the jury to listen to the cross-examination of Ammons, or otherwise control the testimony that they wished to hear.

**The Jury Did Not Commit Misconduct By Learning of the Shelter-in-Place Order**

Shivers argues that the jury committed misconduct by learning of the shelter-in-place order issued on the morning of what would be the final day of deliberations and that the trial court erred in its response to the jury's question regarding the order.

**Additional Background**

After closing arguments concluded on the afternoon of Thursday, March 12, the jury was dismissed until Monday, March 16, at 9:30 a.m.

On that Monday morning, the trial court explained:

14

"So we're in the middle—the record should be clear—I mean, if it's not already—we're in the middle of the COVID-19 national emergency with directives coming out of various federal and state agencies on a daily, hourly basis.  The upshot is as of over the weekend, there's pretty firm directives to have people of a certain age stay home; and there are directives that, for social distancing, to limitation [*sic*] gatherings over 50 people or more.

"So Juror No. 7 has been e-mailing in . . . .  He's here, but he's really concerned about the jury room upstairs and their ability to be safe and socially distanced upstairs.  And I imagine there's going to be other jurors with the same feeling.  [¶]  So with that in mind, I'm going to, with the okay of counsel, offer up the courtroom for deliberations after instruction.  And there would be no court staff in here. . . ."

"That's one thought.  I want attorney feedback on that.  The other is whether I should poll the jury and see if they wouldn't rather go home and choose to come in another day."

After the prosecutor indicated she preferred the first option and some further discussion with the courtroom deputy, the trial court asked defense counsel:

"THE COURT:  Thank you. [¶] Mr. Singh?

"MR. SINGH:  I'm okay with the first option for now.

"THE COURT:  Which is?

"MR. SINGH:  Let them deliberate in the courtroom so long as they can keep distance from each other and don't feel reasonably rushed to decision because of it.

"THE COURT:  Trying to get out of here?  Yeah.  Let's try that."

The jury was then brought into the courtroom, the trial court explained that they would be allowed to deliberate in the courtroom in order to provide

15

for social distancing, and the court instructed the jury. Jury deliberations began at 11:30 a.m.

At some point that morning, the Health Officer of Alameda County issued a shelter-in-place order, to take effect at midnight.

At 1:48 p.m. the trial court emailed counsel for the parties, indicating that the Ammons testimony would be read back to the jury and adding: "Around 4:15, if there is no verdict, please come together outside the elevators on the third floor. I think in that situation I will have to recess the trial at least until the local Shelter-in-Place order is lifted."

At 3:05 p.m., the jury sent the court a written note:

"How does the Alameda County Shelter-in-Place order impact the jury? How late can we work today?"

At 3:19 p.m. the trial court emailed counsel and indicated he was planning to answer the question by saying "You may work as late as 5:30 today. At that time, the court will answer the first question if necessary." Defense counsel replied, "This is fine by me."

At 3:55 p.m., the jury indicated it had reached its verdict.

**Motion for a New Trial**

Shivers moved for a new trial, including on the ground that the jury had committed misconduct by learning of the shelter-in-place order. Attached to the motion was a declaration from juror Joseph Y., who stated as follows regarding the deliberations:

"9. Around the noon hour, I learned of reports that the Bay Area was preparing for a Shelter in Place order. I do not recall how I learned this information but noted that nearly everyone in the jury was aware and talking about it. I started to pay attention to the news using my phone, as did other jurors in the courtroom. We began to share information with each other

16

about the Shelter in Place order as we received updates on our phones. In addition, we talked amongst each other about the order including that Alameda County was going to be affected by it and that it would take affect later that day.

"10. As we continued deliberating, we started to have conversations about how long we could continue deliberating given the impending closure. Some jurors stated that if we did not reach a verdict that day, we would not be able to return the following day. I do not recall who said what, but I also shared the concerns expressed by other jurors. We started to have conversations about what would happen if we did not reach a verdict and the consensus was that we would have to return at some point in the future to resume deliberations. Some of the jurors stated that an extended closure would cause us to forget important details of the case and that we would have to listen to the evidence all over again. I shared the same concerns as these jurors.

"11. Around 3:00 p.m. that afternoon, we decided to send a note to the judge asking for clarification. We asked the judge how long we could deliberate and how the shelter in place order was going to affect us.

"12. Around 3:25 p.m., we received the court's response indicating that we could work as late at 5:30 p.m. and that we would receive an answer to the second question at that time.

"13. After receiving the court's reply, we discussed the fact that we needed to reach a verdict by 5:30 p.m. or else we would be adjourned for an unknown amount of time. [From there, the deliberations became hurried.][7]

_____

[7] At the hearing on the motion, the trial court excluded the bracketed portions of the declaration under Evidence Code 1150, subdivision (a): "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence

17

"14. I was concerned that a case of this magnitude required more time and encouraged the jurors to take their time and not to rush. [I did not believe that the environment we were operating in was conducive to calm, thorough deliberations. From conversations with jurors, I realized that many jurors were anxious to go home and prepare for the shelter in place.]

"15. Ultimately, we reached a verdict on second degree murder about a half hour after receiving the judge's response.

"16. I cannot say that my decision would have been different had I had more time to deliberate but I believe that the time pressure created by the impending shelter in place lessened the burden of proof and created a nonideal environment to deliberate, leading to a rushed process."

The trial court denied the motion for a new trial. The court first found that there was "nothing to correct simply because jurors received information over the news" because "[w]e were all following very important news that day" and "the Court should not and did not presume improper influence of this news on jurors." There was no allegation of misconduct nor did the defense ask the court to do anything differently at the time of the jury's note. The trial court also concluded that its response to the jury's note was not misleading or inaccurate.

---

may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent or to dissent from the verdict or concerning the mental processes by which it was determined."

18

**Standard of Review**

Under section 1181, subdivision 3, the trial court may grant a new trial when the jury has "been guilty of any misconduct by which a fair and due consideration of the case has been prevented."

Where allegations of juror misconduct are based on facts that are essentially undisputed, we review de novo whether misconduct occurred. (See *People v. Peterson* (2020) 10 Cal.5th 409, 467; *People v. Collins* (2010) 49 Cal.4th 175, 242.)

**Analysis**

Shivers contends that the jury's consideration of the shelter-in-place order was misconduct based on the rule that "[i]t is improper for a juror to receive information outside of court about the pending case, and to discuss the case with nonjurors." (*In re Carpenter* (1995) 9 Cal.4th 634, 647.) But the information in *In re Carpenter* was the fact that the defendant had been convicted of certain other crimes and sentenced to death, a fact the juror in question learned from outside sources and then shared with other jurors. (*Id.* at pp. 642–643.) By contrast, the information at issue here was not "about the pending case." It had nothing to do with the defendant, the murder, the witnesses, or anything else related to the trial. Instead it was general news of an extremely important worldwide event that jurors could hardly have avoided if they tried. Jurors do not commit misconduct through exposure to important news, not related to the case, while they deliberate.

For the proposition that jurors cannot rely on outside information even where it is not related to the case, Shivers relies on *People v. Danks* (2004) 32 Cal.4th 269, 308, a death penalty case where a juror brought a passage from the Bible to the deliberation room and shared it with other jurors. Our Supreme Court briefly observed that the juror had committed misconduct,

19

before going on to find that it was not prejudicial. (*Ibid*.) But in *Danks*, the jury was deliberating about whether to impose the death penalty, and thus the bible passage had relevance to the question before the jury. (*Id*. at pp. 298–299.) The other cases relied on by Shivers similarly involved case-specific information. (See *In re Carpenter*, *supra*, 9 Cal.4th at p. 647; *People v. Nesler* (1997) 16 Cal.4th 561, 579 [juror "sat in a bar while a woman revealed damaging information about defendant for half an hour"].) Here, the alleged misconduct was simply hearing news about a quickly developing public health emergency that had nothing to do with the case—or with the questions before the jury.

**The Trial Court Did Not Err in Responding to the Jury's Question Regarding the Shelter-in-Place Order**

Shivers also argues that the trial court erred in two respects after it received the jury's question regarding the shelter-in-place order: first, that the trial court "should have *sua sponte* delivered a cautionary instruction that the jury should focus solely on this case, and that it should disregard extraneous information, such as the impending shelter-in-place order," and second, that the trial court's response to the jury's question "gave the jury a 5:30 p.m. deadline" and thus pressured the jury to reach a verdict.

Shivers has waived these arguments. As noted, defense counsel was informed of the jury's question regarding the shelter-in-place order, did not request any curative instruction, and expressly responded by email that the trial court's proposed response was "fine by me." (See *People v. Stanley* (2006) 39 Cal.4th 913, 950 [claim of juror misconduct waived by failure to object or seek a mistrial]; *People v. Black* (1963) 216 Cal.App.2d 103, 115; *People v. Dykes* (2009) 46 Cal.4th 731, 802–803 [defendant forfeited argument that trial court's response to jury's question was inappropriate by failing to

20

object until after trial court gave response to jury]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 ["Inasmuch as defendant both suggested and consented to the responses [to a jury question] given by the court, the claim of error has been waived"].)

In any event, the arguments are without merit. Shivers does not cite any authority holding that a trial court has a sua sponte duty to instruct the jury not to consider extraneous information under circumstances such as those here. The cases he cites are situations where what was purportedly juror misconduct was found harmless in part because of an admonition from the trial court or jury foreperson. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 925; *People v. Leonard* (2007) 40 Cal.4th 1370, 1426; *People v. Lavender* (2014) 60 Cal.4th 679, 688 [discussing cases].) As we have just discussed, there was no misconduct here and thus no need to consider the issue of prejudice.

With respect to the argument that the trial court exerted improper pressure on the jury to reach a verdict with its response to the jury's question about the shelter-in-place order, we disagree that the response did anything of the kind. The trial court simply told the jury that if deliberations were ongoing at the end of the day, the court would determine how the shelter-in-place order would effect further deliberations at that time. There was nothing coercive about this statement, and nothing that pressured the jury to reach any verdict—certainly not a guilty verdict.[8]

---

[8] The cases cited by Shivers are not to the contrary. In *People v. Keenan* (1988) 46 Cal.3d 478, 534, the trial court made "comments on Friday that it had expected a prompt penalty verdict and would 'appreciate' a decision on Monday," comments that our Supreme Court found did not "have a coercive connotation" in part because of other comments made by the trial court, including its subsequent statement that it had not intended "any

**The Trial Court Did Not Err in Denying the *Youngblood* and *Trombetta* Motion**

Before trial, Shivers moved to dismiss the case pursuant to

*California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*) and *Arizona v.*

*Youngblood* (1988) 488 U.S. 51 (*Youngblood*), based on the alleged

destruction of a recording of an interview of Carrie Mason at the police

station shortly after the murder.  In a declaration attached to the motion,

defense counsel indicated that he had requested a copy of Mason's interview,

and initially received a DVD that "abruptly shuts off after approximately 30

minutes."  Defense counsel was then told by the district attorney that there

were technical difficulties with downloading the interview, and was provided

---

earlier remarks to suggest what verdict the court deemed appropriate."
*People v. Gainer* (1977) 19 Cal.3d 835, 851 held that "it is error for a trial
court to give an instruction which . . . states or implies that if the jury fails to
agree the case will necessarily be retried." (*Id*. at p. 852.)  The comments
here are a far cry.

     *Caldwell v. State* (2005) 164 Md.App. 612, 644–645 is similarly
unpersuasive.  There, the court interrupted jury deliberations because the
courthouse was closing in advance of an impending hurricane.  (*Id*. at p. 624.)
The court learned from the foreperson that the jury had reached unanimous
verdicts on all but three counts, and ultimately recorded those verdicts and
entered a mistrial on the remainder.  (*Id*. at pp. 626–629.)  Relying heavily on
the fact that the jury's deliberations were interrupted, the Court of Special
Appeals of Maryland found that the verdicts were partial and tentative in
violation of the defendant's right to a verdict by unanimous consent (*id*. at pp.
643–647), concluding its analysis with the following dicta: "Finally, while we
conclude that it was error for the trial court to accept the partial verdicts, we
do not agree that the trial court took any action to coerce the verdicts.  To the
contrary, deliberation conducted after the announcement of an emergency
closure of the courthouse would have been a deliberation in a coercive
environment." (*Id*. at p. 647.)  Here, by contrast, there was no closure of the
courthouse, and no indication that deliberations could not continue past a
certain point in time—the trial court's response simply indicated that how
deliberations would continue given the shelter-in-place order would be
resolved at the end of the day.

with five DVDs created by using a video camera to record the computer screen. These DVDs were also incomplete—the recording would stop and have to be manually restarted by a technician, at which point it would resume at a different portion of the interview. The problem persisted when defense counsel attempted to view the recording directly at the Oakland Police Department. Defense counsel was never able to review the complete interview, and was eventually informed that the Oakland Police Department no longer had the server on which it was stored.

Shivers argued that the government had failed to preserve material evidence, that comparable evidence could not be obtained under *Trombetta*, and that the recording was destroyed in bad faith under *Youngblood*, and moved to dismiss. A hearing on the motion was held, at which hearing Detective Barocio, the primary investigating officer on the case, testified as follows:

On the evening of the shooting, while Detective Barocio was still at the scene, Sergeant Rich Vass and Detective Jimenez interviewed Mason in room 203 at the Oakland Police Department. Room 203 had a Bosch recording system set up to create video of interviews.

Detective Barocio received a summary of the interview from Sergeant Voss and Officer Jimenez, which he included in his investigative report. A couple days later, Detective Barocio attempted to play the interview on the Bosch system, was able to play the beginning, and attempted to copy the interview to a CD. He was later informed that the interview on the CD was incomplete. After the beginning of the interview, the recording would pause at a certain location, and would skip over multiple portions of the interview. Detective Barocio tried "[e]asily a dozen times" to download the full interview, including by using a video camera to directly record the Bosch TV,

23

which would enable him to create 5 DVD discs of the interview.  However, the interview continued to pause.  Detective Barocio also enlisted the help of several other officers, who all had the same problem, and the IT department, which had no knowledge or expertise regarding the Bosch system.

Detective Barocio met with defense counsel and a defense inspector regarding the video and gave them full access to the system so they could attempt to download it.  Defense counsel told Detective Barocio that his office had not been able to record anything because they had the same problems with the system.  Detective Barocio also contacted the district attorney's office and informed them of the issue.  The district attorney asked that Bosch be contacted, and Officer Crumb did contact Bosch.  Officer Crumb told Detective Barocio that the server had been destroyed.

The department stopped using the Bosch system by Spring of 2018.  For a time, they "kept the server there just for any necessary downloads that needed to be done still."  Other than the first CD with the first 30 minutes of the interview and the five CDs created by recording the screen, those were the only attempts to copy the information on the server.  Eventually the department "got rid of the entire server."

When asked by the trial court whether the issue was "a recording issue or a retrieval issue," Detective Barocio answered:  "I think it was a recording issue, your Honor.  Because it is recording fine for 30 minutes.  And then pauses and skips over."  When asked whether "to your knowledge, the entire interview was recorded," Detective Barocio answered "No.  When you see the CD it goes 30 minutes, roughly.  There's a pause.  I am not sure if there's a recording.  Because as you know, you could skip over that portion.  I am not sure if it recorded during that time period."

After hearing the argument of counsel, the trial court denied the motion:

"THE COURT:  Okay.  This is a hot mess.  There's an initial matter, I'll find there was no bad faith here.  But there was negligence.  It's not that they did everything that they could do.  Doing everything that they could do would be  the District Attorney's Office communicating distinctly and clearly with O.P.D. to maintain the server until a technician from the Bosch Corporation could come out and let them know what they have or don't have on the server.  That was never done.  But it being—well, I don't find there was bad faith.

"The other question is what was actually lost.  I can't find as well that a recording was destroyed.  So it's not like we're dealing with a situation where we know that there ever was a videotape with audio of Carrie Mason saying the critical fact or facts that the defense wants to impeach her with.  The record is not clear of that, that that's the case.  And even if it were the case, there's the additional fact that the defense can still impeach her.  It's just not as, potentially not as effective or convincing to the jury.  But that remains to be seen."

The trial court went on to order that "Officers Jimenez and Vass draft as detailed and complete statements as possible, of their interview of Carrie Mason on or about December 12th, 2017."

**Applicable Law**

" 'Due process does not impose upon law enforcement "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." ' (*People v. Wallace* (2008) 44 Cal.4th 1032, 1083, quoting *Youngblood*[, *supra*,] 488 U.S. [at p.] 58.)  At most, the state's obligation to preserve evidence

25

extends to 'evidence that might be expected to play a significant role in the suspect's defense.' (*Trombetta, supra*, 467 U.S. at p. 488; accord, *People v. Alexander* (2010) 49 Cal.4th 846, 878.)  If the evidence's exculpatory value is apparent and no comparable evidence is reasonably available, due process precludes the state from destroying it.  (*Trombetta*, at p. 489; *Alexander*, at p. 878.)  If, however, 'no more can be said [of the evidence] than that it *could have* been subjected to tests, the results of which *might have* exonerated the defendant' (*Youngblood*, at p. 57, italics added), the proscriptions of the federal Constitution are narrower; 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law' (*id*. at p. 58; accord, *People v. Tafoya* (2007) 42 Cal.4th 147, 187; *People v. DePriest* (2007) 42 Cal.4th 1, 42.)"  (*People v. Duff* (2014) 58 Cal.4th 527, 549.)

We review the denial of a motion under *Trombetta* and *Youngblood* for substantial evidence.  (*People v. Montes* (2014) 58 Cal.4th 809, 837.)

**Analysis**

In this case, substantial evidence supports the trial court's determination that a complete video of the Mason interview was not "destroyed" within the meaning of *Trombetta* and *Youngblood*.  Detective Barocio's first attempt to download the video to a DVD resulted in an incomplete video that would pause early on in the recording.  Numerous subsequent attempts to download the video, including by other officers with more experience, were unsuccessful.  Detective Barocio attempted to record the interview as it played directly from the source, but the interview paused and malfunctioned here as well.  Detective Barocio testified that he never saw the complete interview, that he "thought it was a recording issue," and that he was "not sure whether [the system] recorded" during the missing

26

portions of the interview. In short, substantial evidence supports the trial court's conclusion that the missing portions of the Mason interview were never recorded at all.

And Shivers failed to establish that the video "might be expected to play a significant role in [his] defense," that is, the evidence possessed "an exculpatory value that was apparent before the evidence was destroyed." (*Trombetta, supra*, 467 U.S. at pp. 488–489.) It was Shivers's burden to make a threshold showing that the video of the interview had exculpatory value, as opposed to being merely potentially useful to the defense. (See *People v. Alexander* (2010) 49 Cal.4th 846, 879 ["We agree with the trial court that defendant failed to sustain his burden of proving the threshold requirement that the unavailable evidence had any exculpatory value"].) But Shivers failed to make any such showing.

As noted, Mason was a key witness for the prosecution, and her testimony was, in general, *inculpatory*. Shivers's argument that the videotape had exculpatory value is based on speculation that Mason may have made statements during her interview inconsistent with her testimony at trial that could have been used by the defense for impeachment. As evidence that this was the case, Shivers points to certain inconsistencies between Mason's preliminary hearing testimony and her trial testimony, for example, regarding whether Shivers approached Lee and asked him to move his car once or twice, whether she saw Shivers with a gun or merely heard the gunshots, which hand Shivers used to punch and shoot Lee, whether Mason's eyes were open or closed when the gun fired, who was in her car when she drove to the store, and which direction her car was parked. But these relatively minor inconsistencies *were* used to impeach Mason at trial, whose testimony the jury nevertheless credited. Shivers's speculation that

the video interview would have contained further, similar inconsistencies that could have impeached Mason's trial testimony does not demonstrate that the video of that interview had "apparent exculpatory value" as opposed to being merely "potentially useful" to the defense. (See *People v. Pastor Cruz* (1993) 16 Cal.App.4th 322, 325 [finding no *Youngblood/Trombetta* violation where police lost the knife in case of assault with a deadly weapons because "a discrepancy in size [between seized knife and the victim's description] might eventually prove useful to a defendant in impeaching a witness but is not the type of evidence that a reasonable police officer should be expected to recognize as having apparent exculpatory value"].)

Finally, assuming the recording was "potentially useful" to the defense, the trial court's finding that the police did not act in bad faith by allowing the server to be destroyed is also supported by substantial evidence. Detective Barocio testified that as soon as he learned the recording was incomplete, he made "easily a dozen" attempts to obtain a complete copy, including by directly recording the Bosch screen onto 5 DVDs that were provided to the defense. Detective Barocio contacted numerous other officers for help in attempting to retrieve the video, as well as the IT department. And he provided the defense unfettered access to the Bosch system so that they could attempt to obtain the video for themselves. Only after all these steps had been taken did the department allow the server itself—which may never have contained a complete recording to begin with—to be destroyed as part of the department's phasing out of the Bosch system. The trial court's finding that the department did not act in bad faith is supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.

28

_____

Richman, Acting P. J.

We concur:


_____

Stewart, J.


_____

Miller, J.

*People v. Shivers* (A161307)

29